## Ashbridge's Estate

LADNER, J., Auditing Judge.—Hon. Samuel H. Ashbridge, a former mayor and for many years a coroner of Philadelphia, died March 24, 1906, having first made his last will and testament dated January 4, 1904, and codicils thereto dated October 26 and December 30, 1905, respectively. . . .

By item 7th of testator's will he provided:

"Seventh. Upon the death of my said wife Anna J. Ashbridge I order and direct that the portion of the principal of my estate from which she shall have been deriving income at and immediately before her death shall be distributed as follows: . . .

"The balance of that portion of the principal of my estate from which my wife shall have been deriving income at and immediately before her death shall be held and disposed of by my said executors as follows:

"In consideration of the fact that many worthy women are left in destitute circumstances and in recognition of the many honors conferred upon me by the people of Philadelphia, amongst whom I have always lived, I direct my Executors and Trustees as soon after the decease of my wife as possible to found and establish a Home in the City of Philadelphia or its immediate suburbs, to be called the 'Samuel H. Ashbridge Home for Indigent Widows and Single Women' the sole object and purpose of which shall be for the support and maintenance of indigent and worthy widows and single women who, when first admitted to the Home, shall not be less than fifty years of age, and whose circumstances and necessities compel them to seek shelter and maintenance. The Home shall be undenominational and non-sectarian, but the Board of Managers shall from time to time have religious services conducted therein by clergymen of the various denominations. No charge shall be made for admission, support or maintenance of any of the residents, and upon the death of any resident without relatives or means wherewith to bury her she shall be given a reasonable and proper burial from the income of said Home, and to that end I direct my Executors and Trustees aforesaid to transfer and convey for the purpose of the Home the two burial lots owned by me in Hillside Cemetery for a burial place for those who dying at the Home have no other place of burial. In admitting applicants preference shall in all cases be given first to those who are actual residents of the City of Philadelphia, and secondly to those who have been residents of that city, although at the time of making application they may reside elsewhere. The Home shall be managed and conducted by a Board of Trustees or Managers composed of nine citizens of Philadelphia, three to be appointed or elected by the Board of Judges of the Courts of Common Pleas of the County of Phila-

delphia; three to be appointed or elected by the Grand Lodge of the Independent Order of Odd Fellows in Pennsylvania, and three to be appointed or elected by the Pennsylvania State Council Order of United American Mechanics. The said Board shall serve for three years or until their successors are appointed or elected, and the appointing powers shall in all cases have the right to remove, with or without cause, and to fill vacancies caused by expiration of term, resignation, removal or for any other reason. In the event of one or both of the said Orders ceasing to exist, the Board of Judges aforesaid shall thereafter fill the vacancies caused by such contingency. The Board of Trustees or Managers shall alone have power to admit qualified applicants to said Home, and shall also have power at any time to discharge, with or without cause, any of those who may be admitted; the decision of said Board in all cases to be final. I order and direct my Executors to make application for and procure a charter of incorporation for said Home and to make such provision for the election of the necessary corporate officers as they shall deem proper; my preference being that the said corporate officers shall be elected by and from the Board of Trustees or Managers to be appointed as hereinabove mentioned. As soon as said Home is properly organized and incorporated, I direct my Executors and Trustees, to deliver over, assign and convey to the said Home the balance of that portion of the principal of my estate from which my wife shall have been deriving income at and immediately before her death. The said principal to be kept intact and to be held and invested for the purposes of the Home and the income alone to be used for the expenses thereof."

By the codicil of December 30, 1905, testator revoked the legacies given in the 7th item to Lena De Barth, Edna Diernbach and the Hahnemann Hospital and gave the amount of said legacies upon the death of his

wife to the Samuel H. Ashbridge Home for Indigent Widows and Single Women as provided in his will.

Upon the listing of this account before me for audit, Mr. James, counsel for accountant, informed the court that the net amount now available for the charitable purposes, approximately $60,000, would be far too small to establish a home; hardly enough to purchase a site on which to build a home, let alone endow the same; that the plan of the testator has become impossible of fulfillment in accordance with his directions, and that the court should exercise its cy pres power and make an award to other institutions in a way to approximate testator's wishes.

In order to enable the auditing judge to intelligently exercise this cy pres power and to give representation to the unascertained charitable objects of testator's bounty, namely, the indigent widows and single women over the age of 50 years, sought to be benefited, and in conformity with the established precedents of this court, the auditing judge directed counsel for the accountant to present a petition for the appointment of an amicus curiæ with the powers of a master. Accordingly, such petition was presented, pursuant to which the auditing judge by decree dated February 21, 1946, appointed Richard K. Stevens, Esq., amicus curiæ with the powers of a master, with instructions to advertise his appointment once a week for three successive weeks in The Legal Intelligencer and one other newspaper of general circulation in the city, so as to give notice to all institutions or other parties that might be interested that it was his intention: (a) To hold meetings in furtherance of his appointment; (b) at such meetings to receive testimony of claimants to the three-quarters share of decedent's estate bequeathed by testator for the founding and establishing and maintenance of a Home for Indigent Widows and Single Women; (c) to investigate the qualifications of all charities

which advanced claims to said fund, and (d) to report his findings to the auditing judge and recommend a charity or charities to which said fund should be awarded cy pres. The original petition and decree will be found annexed hereto.

Obedient to said decree and by the authority thereby vested, Mr. Stevens fully advertised as directed and in addition gave written notice to institutions that might be interested. The names of such institutions he obtained from the Council of Social Agencies, 311 South Juniper Street, Philadelphia. Pursuant to notice advertised and so given, the amicus curiæ held a hearing on April 9, 1946, in Courtroom 432, City Hall. All proceedings before him were reported stenographically and from the transcript of the proceedings it appears some 20 or more organizations appeared by representative or counsel to claim said fund. These were required to file answers to a questionnaire carefully prepared by Mr. Stevens, and thereafter further hearings were held at his office in which all the organizations thus requesting the award of the fund cy pres were given an opportunity to be heard.

Some six meetings were held altogether upon the conclusion of which he filed a careful, well-considered report. In his report, Mr. Stevens, the master, correctly analyzes the 7th item of Mayor Ashbridge's will, which directs the establishment of the Ashbridge Home. Mr. Stevens sets forth 13 directions which comprise testator's plan of charity, and which must form the guide to the cy pres award of the fund. These directions or requirements are:

1. The name to be "Samuel H. Ashbridge Home for Indigent Widows and Single Women".

2. The sole object and purpose to be for the support and maintenance of indigent and worthy widows and single women;

3. These women to be not less than 50 years of age;

4. The circumstances of the women to be such as to compel them to seek shelter and maintenance;

5. The home to be undenominational and nonsectarian;

6. The home to have religious services conducted from time to time by clergymen of various denominations;

7. No charge to be made for admission, support or maintenance;

8. Provision to be made for burial where necessary;

9. The home to accept conveyance of two burial lots;

10. Preference to be given first to the actual residents of Philadelphia, and second, to those who have (a) Three to be appointed by the Board of Judges; been residents of the city;

11. The home to be conducted by a board of trustees: (b) three to be appointed by the Grand Lodge of the Independent Order of Odd Fellows; (c) three to be appointed by the Pennsylvania State Council, Order of the United American Mechanics;

12. The board to have the right to admit and discharge;

13. Income only from the fund to be used after initial principal expenditures;

The learned amicus curiæ, after hearing testimony in support of the applications of the institutions that ask the award to them of the fund for distribution cy pres, recommends that the fund be divided and awarded as follows:

1. One third thereof to the Home for Aged and Infirm Colored Persons, the same to be added to the building fund of said institution and used either in the acquisition of a new home or for construction of a new home;

2. One third thereof to the Nazarene Home for the Aged, as much of the fund as may reasonably be necessary to be used for physical improvements or additions;

the balance to be retained in endowments, with the right in the home to use said balance of principal at any time for improvements or new construction.

3. One third thereof to the Indigent Widows and Single Women's Society of Philadelphia, the fund to be used for the alteration or construction of a wing so as to enlarge and modernize the dining room and infirmary, any funds not so used to be retained in endowment and to be available in the future for physical improvements at the discretion of the home.

The general recommendation is made that the awards be conditioned on each institution giving proper recognition to the name, Samuel H. Ashbridge, by designating a wing or other physical improvement in honor of the decedent with an appropriate plaque or plaques.

Upon completion of his report, Mr. Stevens sent notice to all claimants to the fund that the same would be presented to the auditing judge on March 5, 1947, and stating that any exceptions thereto shall be filed with him prior to that date. Exceptions were filed by three claimants: The Fraser Home for Women, the Messiah Universalist Home, and the Tilden Home for Aged Couples of the City of Philadelphia. After hearing argument on these exceptions, the learned amicus curiæ filed a supplemental report setting forth why in his judgment the exceptions should not be sustained, and recommending their dismissal. Thereafter, the matter was fixed by me for audit on April 9, 1947, at which time the record before the amicus curiæ, his reports and file of proceedings were offered in evidence and in absence of objection were accepted and directed to be made part of the record of the audit. The respective counsel for the recommended institutions as well as counsel for the three exceptants appeared and argued for and against the exceptions and approval of Mr. Stevens' reports.

At the suggestion of the auditing judge there also appeared Mr. Joseph P. Gaffney, counsel for the Board of Directors of City Trusts, who presented a resolution of that board to the effect that the board would accept on behalf of the City of Philadelphia, trustee, any awards that the orphans' court might choose to make cy pres of the funds of the estate of Samuel H. Ashbridge, deceased. Such resolution or copy thereof is annexed hereto.

At the audit Mr. Gaffney argued that the fund should not be divided and that the wishes of deceased testator could best be approximated by having the Board of City Trusts, or some other trustee, invest the principal and use the income thereof to pay to existing institutions for the admission and board of such indigent widows and single women who qualify under the terms of the will. Mr. Gaffney argued that on reading the will of Mayor Ashbridge it was clear that there were three things that he had in mind. First he had in mind a definite class of Philadelphians he wanted to benefit; second, the place where they were to be benefited came next to his mind. They were to be benefited in a home. Third, whether as a matter of personal pride or not, he wanted them taken care of in a home named after him that his estate would found. These were the main purposes of his charity. Of the three, argued Mr. Gaffney, the only thing that could not be carried out was the founding and maintenance of the home because his estate was not sufficient.

Able counsel for all the recommended institutions and for exceptants argued skilfully and fully the merits of their respective institutions, and their intelligent arguments were of great assistance to the auditing judge in coming to the conclusions now reached.

The principle, governing the application of the cy pres doctrine has been most recently reiterated by Mr. Justice Jones in Williams' Estate, 353 Pa. 638, where,

at page 643, he quotes from Mr. Justice Horace Stern's opinion in Wilkey's Estate, 337 Pa. 129, 132, 133, as follows:

"In applying the principle of cy pres the court does not arbitrarily substitute its own judgment for the desire of the testator, or supply a fictional testamentary intent, but, on the contrary, it seeks to ascertain and carry out as nearly as may be the testator's true intention . . .". Mr. Justice Jones then continues, "But, once the applicability of the cy pres doctrine is indicated, the problem forthwith becomes one of approximating the testator's express direction as nearly as possible and without doing violence thereto. In an early and leading case of this State, subsequent to the Act of 1855 (The City of Philadelphia v. The Heirs of Stephen Girard, 45 Pa. 9, 28), it was said that 'The meaning of the doctrine of cy pres, as received by us, is, that when a definite function or duty is to be performed, and it cannot be done in the exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close approximation to that scheme as reasonably practicable; and so, of course, it must be enforced. It is the doctrine of approximation . . .'. That statement as to the object to be attained by an application of the cy pres doctrine has since been approved and followed by this Court a number of times without departure."

After carefully studying the record and listening to the arguments of the learned counsel of respective claimants, I have come to the conclusion that I cannot adopt or approve the amicus curiæ's recommendation.

At the audit I indicated that there was a grave doubt in my mind as to the power of this court to divide a fund under the cy pres doctrine, and asked counsel if there were any cases on the subject. But diligent search of counsel and my own research has disclosed but two cases in which the question arose but was

never decided. Thus in Stallman's Appeal (Harmony School House Fund), 38 Pa. 200 (1861), the fund came from the sale of land originally donated in 1794 for the erection of an English Protestant school for the use of the neighborhood in general. The land was located in Chestnut Hill Township near the dividing line of Springfield Township and as both townships comprised the neighborhood, both contributed equally to the erection of the school house, which was discontinued in 1857, and the property sold. The funds were equally divided by the auditor between Springfield Township of Montgomery County and the City of Philadelphia with which Chestnut Hill Township had been consolidated. No exceptions were filed either to the division of the fund or to the award to the Springfield Township, but exceptions were filed to the award of one half to the City of Philadelphia to be applied to the expenses of education. Only this question was decided by the Supreme Court and the award was reversed as being a diversion of the fund. Obviously, the special facts of that case, even had the question been decided, would have made it no precedent here.

The other case, Commonwealth v. Pauline Home, 141 Pa. 537, was a case in which the fund arose from the sale of the property of a discontinued charitable institution. The fund was awarded cy pres to another. Exceptions were filed by claimant on the ground that part of the fund should have been allotted to the Germantown Dispensary, which held assignments of a large number of original contributors. These exceptions were dismissed and affirmed on the ground that while recommendations of contributors should have weight with the court, the award would not be reversed without a clear abuse of discretion. The question of the right or power of the court to divide was not decided.

The auditing judge comes to the conclusion that while this court might have power in a proper case to divide a fund cy pres, such power should only be exercised where there is no other means of approximating testator's own plan. This is clearly not such a case, as will appear after an examination of the facts found by the amicus curiæ in support of each of the recommended institutions.

### Home for Aged and Infirm Colored Persons

The report recommends one third of the fund to the Home for Aged and Infirm Colored Persons, located at 4400 Girard Avenue, Philadelphia. Mr. Stevens finds that this is a colored home, whose charter was granted in 1867; it takes women not less than 50 years of age. At the time of the hearing it had 87 residents, of whom 62 are women and 25 are men. The home is undenominational and nonsectarian, but religious services are regularly conducted there. Until 1938 the admission charge of $400 was made but since then applicants have paid board supplied in a great majority of cases by the old age assistance. The Community Fund has contributed about $20,000. Preference is given to people from Philadelphia area. There is a waiting list of 300 and this is increased by at least one a day. The building in which it is located has been condemned and the organization has been hard put to find a new building. Any funds received would be applied to a new building. The organization has $150,000 of endowment funds.

The court is in accord with the belief of the amicus curiæ that this is a worthy institution which is in dire need. But necessity alone cannot be the basis of awarding a fund cy pres. It does not fit in with the testator's plan of charity in several respects, among which are: It is a home for *men* as well as women; it charges board; it is a home for colored people alone. Mayor

Ashbridge in his home made no restriction as to race, creed, or denomination as to the indigent widows and single women to be admitted. I ought therefore to make no award to an institution designed to accommodate a particular race any more than to a sectarian institution. Moreover, awarding one third of the fund to this institution in order to enable them to purchase or erect a new building, would afford relief only to existing inmates (men and women) and those on the waiting list now said to be 300 or more. It would not be benefiting any other "indigent widows and single women" at least for a very long period of time, if ever.

### Nazarene Home for the Aged

The Nazarene Home for the Aged is located at 2032 West Columbia Avenue, Philadelphia. This institution is recommended to receive another third of the fund. The amicus curiæ finds that this institution has recently purchased a new home at 469 Flamingo Street, Roxborough. Under its charter it can take both males and females, but in practice, has never taken men. All women guests are over 65 years of age. At present there are 22 residents but a new building will permit four more. All inmates have been from Philadelphia. About 75 of the inmates have been Protestants, mostly Presbyterian, Methodist and Baptist. There are no denominational or sectarian requirements for admission. This same procedure has been followed in practice. Religious services are conducted every Sunday afternoon by clergymen of various denominations. Guests enter under various arrangements, some pay board, some by a lump sum and assign their assets. Present requirement for a lump sum admission is $1,200. Those with over $500 have in practice been accepted. The home proposes to erect a new wing if funds are awarded to it. This will take the form of a solarium which will cost about $8,000. Any balance

would be used to increase the size of the home and permit more guests. There is a present waiting list of between 30 and 40. Any new wing would be named for Mr. Ashbridge.

There is no requirement that the home retain its present name and it was suggested it might be changed to the Ashbridge Nursing Home. The home has no endowment fund. It operates by contributions and money received from boarders. Unless new moneys were used to increase the size of the home, no new guests could be accommodated. This home would approximate more closely the home Mayor Ashbridge intended founding than the one previously discussed. However, it would have to change its charter to conform with its stated practice of admitting females alone. There are, however, other differences of importance. An admission fee is required and board must be paid. The age limit for admission is 65 or over. Mayor Ashbridge had in mind that those who receive his bounty should not be required to pay anything and they should qualify from the time they were upwards of 50 years of age.

It was stated by the amicus curiæ in his report and also at the audit that the 65-year age limit has been fixed because this is the age at which old people become entitled to public assistance, and in practice most institutions that require board fix it at the rate paid by the State for old age assistance. The relief money is then paid for the board. The Nazarene Home is an admirable institution but the auditing judge is not convinced that making an award of one third of the releasable charitable fund would do much to benefit the people that Mayor Ashbridge desired to help. However, if owing to a change of circumstances or other good reasons it ever becomes necessary for this court to review and modify the disposition presently made of the charitable fund, it might be worth while for

the latter institution to modify its admission requirements to conform more closely to testator's plan as well as taking the Ashbridge name in consideration of an award to it of the entire fund. For the present, however, the auditing judge is constrained to refuse to make the award recommended by the amicus curiæ.

### *Women's Society of Philadelphia, 3615 Chestnut Street, Philadelphia*

The facts found by the amicus curiæ relating to this claimant are as follows: That this institution is a long-established one, with 112 guests. It has an endowment of $868,000, an income of $50,000, or at the rate of $450 per guest. It was stated in answer to the questionnaire that the society would like to build a wing so as to enlarge and modernize the dining room and infirmary and call it the "Samuel H. Ashbridge Wing".

It appears, however, from the testimony taken before the amicus curiæ answers to the questionnaire, and the report filed by him, that admission to the home is limited to those who have been residents of Philadelphia for at least 10 years and who are between the ages of 65 and 80. Applicants must pay either $1,200 or be eligible to old age assistance from the Commonwealth and pay $35 per month board. Both classes must assign all property they may have, present or expectant, to the home. While the home is nondenominational within the Protestant faith, admission by the rules and regulations is limited to Protestants though in practice it is stated others would be taken. Apparently no Catholics or Jews are among the present inmates. The rule or regulation above referred to makes it a sectarian home. This worthy institution therefore does not conform to Mayor Ashbridge's plan of charity in the following material aspects: It does not admit any indigent widow or single woman below the age of 65; it requires payment of admission fees

or board and assignment of all property to the home, and it is a sectarian institution limited to Protestants.

Here again the auditing judge cannot accept the recommendation of the master not only because it does not sufficiently approximate testator's plan but also because it is frankly admitted that the proposed use of the fund by this institution would not even increase the available accommodations for additional inmates.

Perhaps the basic error of the amicus curiæ which precludes me from approving his recommendations is the failure to recognize that Mayor Ashbridge's primary intent and purpose was to benefit the class described by him and not institutions that accommodate them. Had he wished to benefit institutions he would no doubt have made his gift to one or more of them. It would seem that in every one of the homes recommended by the amicus curiæ the primary benefit would be to the institution for construction of improvements, and the benefit to indigent widows and single women of the class described in testator's will, would be incidental or secondary.

The institutions who are exceptants in the matter, as well as the other institutions that did not file exceptions but made claim, stand in no better position than the three recommended by the amicus curiæ, and while I sustain their exceptions to the award to the institutions recommended by him, I find it impossible to make any award to them in substitution.

## Disposition of the fund

This brings me to the question as to what I should do with the fund. As I have hereinbefore pointed out, it is clear that Mayor Ashbridge had in mind as the principal purpose of his charity the support of indigent widows and single women of 50 years and upwards. He preferred to do it by establishing a home with an endowment so as to make their admissions

absolutely free. That part of his plan cannot be carried out. However, it is possible to give some benefit or relief to such indigent single women and widows by maintaining the fund as a trust fund and using the income thereof to pay for board in or admission to established institutions. The suggestion that the income under present rates of income would be so small is no objection because, small or large, it will be the means of some benefit to the class whom testator desired to help.

It has been pointed out to the court below by the amicus curiæ and by the learned counsel who participated in the argument that since the Old Age Assistance Law many institutions take indigent widows and single women only over the age of 65 and look to the State awards as their compensation or board. However, Mayor Ashbridge intended to help anyone who was in need from the age of 50 years and upwards. It has been suggested that there are not many 50 years of age who need the relief. This may be true, but the point is, there is a strong likelihood of there being many between the ages of 50 and 65 who need help. Is a person, say, of 64, and in dire need, to be left awaiting relief because neither existing institutions nor the State will help until the required age of 65 is attained?

The accounting trustee, an individual, is anxious to be relieved of his trust as to the three-fourths share for charitable purposes which is now releasable, and in casting around for a means of carrying out my conclusion I find that the Board of City Trusts is admirably adapted to handle this fund. It administers many trust funds for the benefit of the city and the citizens of the City of Philadelphia. In fact, it was established for such purpose. It has the machinery which would enable it to take over the administration of this fund at a minimum cost. Its members are appointed by the judges of the courts of common pleas. There-

fore, to some extent, it conforms to the wishes of Mayor Ashbridge that the board of directors of his proposed institution should in part be appointed by the judges of the courts of common pleas.

By this means also, full effect can be given to Mayor Ashbridge's desire that his generosity shall be available to citizens of the City of Philadelphia irrespective of race, creed or color. Thus arrangements for applicants who meet the description as specified by testator can be made for admission to an appropriate home, public or private. It does seem that this furnishes a means for closer approximation to testator's plan of benefaction than a direct award of the fund to existing institutions, however worthy they may be.

In Craig's Estate, 56 D. & C. 135, affirmed 356 Pa. 564, the Supreme Court approved the retention by this court of supervisory jurisdiction of awards made cy pres, so that under future conditions, upon application of proper parties in interest, we may reconsider the award in the light of new and changed circumstances. In the instant case, having in mind that there may be a future sum to be added to the present fund when the remaining life estate falls in, I do not make the award presently in absolute form, but in the award I will retain the jurisdiction in this court with leave to any party or any institution to ask for reëxamination of the question when the outstanding life estate falls in.

Wherefore, until further order of this court, the share of the corpus presently releaseable will be awarded to the Board of Directors of City Trusts, to be held in trust and to be known as the Samuel H. Ashbridge Fund for Indigent Widows and Single Women. Said fund to be invested by them and the net income thereof used for the support and maintenance of indigent and worthy widows and single women residents of the City of Philadelphia, irrespective of race, creed or religion, not less than 50 years of age whose circum-

stances and necessities compel them to seek shelter and maintenance. Said relief to be furnished either by obtaining admission and paying board in an appropriate home, or elsewhere. Annual report to be made to.this court of its administration of this fund. Leave is given to counsel for the Board of Directors of City Trusts to prepare a formal decree embodying these principles and incorporating such further details as may be desirable. . . .

*Townsend Munson,* of *Townsend, Elliott & Munson; Shippen Lewis* and *Harry J. Alker,* for exceptants.

. .*David B. James, Jr.,* for accountant.

SINKLER, J., January 9, 1948.—The effect of the will and codicil is to give the principal of the testamentary trust, after the termination of the life estates, to establish a home to be called as directed, for the support of indigent and worthy widows and single women who, when first admitted, shall be not less than 50 years of age. The fund presently distributable being insufficient for that purpose, the auditing judge appointed Richard K. Stevens, Esq., amicus curiæ, with the powers of a master, to recommend a charity or charities to which the fund should be awarded cy pres. His report is fully summarized in the adjudication, and only his recommendation as to awards need be here repeated: One third to the Home for Aged and Infirm Colored Persons; one third to the Nazarene Home for the Aged; one third to the Indigent Widows' and Single Women's Society.

The auditing judge was of the opinion that no one of the three institutions was fully qualified to fulfill testator's intention. He comes to the conclusion "that while this court might have power in a proper case to divide a fund cy pres, such power should only be exercised where there is no other means of approximating testator's own plan". He does not adopt the recom-

mendations of the amicus curiæ. He holds that, while the chief purpose of testator, the support of indigent and worthy widows and single women of 50 years and upward, cannot be accomplished in the manner intended, it is possible to afford relief to such indigent women by awarding the fund in trust, the income to be applied to maintaining such women in established institutions. He finds further that the Board of Directors of City Trusts is admirably adapted to administer this trust. By this means, indigent and worthy widows and single women over 50 years of age can be cared for "by admission to an appropriate home, public or private".

The adjudication continues that the present award is not made in absolute form, but the jurisdiction of this court is retained, with leave to any party or institution to ask for reconsideration of the question when the outstanding life estate falls in. Therefore, "until further order of this court", the share of the corpus presently distributable, which is three fourths of the entire trust estate, was awarded to the Board of Directors of City Trusts, to be held in trust as directed in the adjudication. The remaining one fourth was awarded to the surviving trustee, as set forth in the adjudication.

The pertinent provisions of the will and codicil are either quoted verbatim or fully recited in the adjudication, as well as the facts. The law upon the several questions is fully discussed. The foregoing recited the issues determined and a further compendium is not required. As above related, the present award is not final in respect of the one fourth which remains in trust when the principal is distributable. To this we add that it is not final with regard to the three fourths presently awarded upon a future accounting.

The exceptions are dismissed and the adjudication is confirmed absolutely.