**Long Asylum Trustees' Petition**

*Charles G. Baker*, for petitioners.

APPEL, P. J., January 21, 1948.—The trustees of the Henry G. Long Asylum have presented to this court their petition asking for relief against the testamentary restrictions requiring the investment of endowment funds in their hands in first mortgages,

and the permission of this court, under the Act of July 2, 1935, P. L. 545, sec. 2, 20 PS §804, to invest certain of the endowment funds in real estate other than in first mortgages, as directed by the will of Henry G. Long and Catharine H. Long, his daughter.

The duties of petitioners are set forth in the will of Henry G. Long, executed July 31, 1886, and since his death on March 5, 1889, duly probated in the office of the register of wills of this county, and in the will of Catharine H. Long, the sole surviving daughter of Henry G. Long, executed September 26, 1889, which (she having died June 18, 1900) was duly probated in the same register's office. Both of said wills have been carried out according to the provisions thereof.

The will of Henry G. Long provides as follows:

"I give and devise to my daughter, Catharine, in trust, and for her use, . . . for and during her life . . . but if at the time of her death she should leave no child or descendants surviving her, then I direct the said two farms, or the income of the net proceeds thereof, should it be considered advisable, as mentioned hereafter, to make sale thereof, shall be appropriated and used as a means for establishing a single woman's asylum, in the City of Lancaster, in which respectable white women, from the City and County of Lancaster and indigent circumstances, above the age of forty-five years, being widows and single women, shall be admitted and maintained, and for that purpose I give the said farms in trust to such four men as the Orphans' Court of Lancaster County shall appoint to take charge of the same, and should the said trustees deem it advisable, with the consent of the said Court, to make public sale of the said two farms, or either of them, at such time and condition as the Court shall deem proper, and may be sold in whole or parts, as will be most conducive to the best interests of the charity hereby intended to be established. . . .

". . . And I also hereby direct that all the moneys, which such trustees may from time to time receive, belonging to such trust, whether arising from rents or sales of real estate, or from other sources, after deducting necessary expenses, *shall be loaned out upon interest and upon first mortgage security* upon property in the City and County of Lancaster, and shall form a basis for a fund for the support of said trust, and *kept at interest on first mortgage security* on property in the City or County of Lancaster, and the incomes (after deducting expenses) arising from said farms, or if sold the net incomes or interest of the proceeds thereof, shall be used for the support and maintenance of such asylum, *and no more inmates are to be admitted therein than such net incomes will comfortably support,* hereby giving authority to the trustees, or a majority of them, if they shall deem it best to do so, to purchase ground and erect a plain, substantial and comfortable building, without indulging in any unnecessary extravagance, as the funds will not admit of it, for the accommodation of the inmates, or to purchase a building, or rent one if they deem it best to do so.

"The women are to be admitted by the acts of a majority of the Board of Trustees, and may be removed in the same way. But are to be admitted without any regard to their religious or political views. . . . all vacancies in the Board of Trustees shall be filled by the surviving members, . . ."

The will of Catharine H. Long provides that the bequests to the trustees shall then "be held and controlled by them under the same terms, provisions and restrictions, conditions and regulations as my father has imposed in his last will and testament with reference to the establishment and management, of the said proposed Asylum."

The real estate subjected to said testamentary trust has been sold, and the proceeds arising therefrom have

been used to erect a building called the Henry G. Long Asylum, and the remaining proceeds of said sale of real estate have been invested as an endowment fund to maintain and support certain persons in accordance with said will.

On the presentation of the petition by the trustees, a hearing was had before this court on November 18, 1947, at which time the facts and circumstances set forth in the petition were substantiated and supplemented by oral testimony. At that hearing . . . the clerk of the trustees of the Henry G. Long Asylum since 1936 and other witnesses were produced on behalf of petitioner. The home, known as the Henry G. Long Asylum, has been in existence since October 1, 1906, and for the first five-year period (according to a statement required to be filed in the office of the clerk of this court) the home cost an average of $164.04 per person per year, from which time the expenses of the home gradually increased and until in the last period from October 1, 1946, to October 1, 1947, it cost the home $521.88 per year per guest. This cost was shown to be more than the income arising from the present investment of the endowment funds.

On October 1, 1947, the mortgages held by the trustees totalled $133,950, and the bond investments were $65,000 in United States Government "G" bonds, $120,000 United States certificates of indebtedness due July 1, 1948, with $7/8$ of 1 percent interest. The investment in Government bonds appears to have been formerly invested in mortgages and was held in the form of Government bonds temporarily awaiting the decision of this court on the petition as filed. On October 1, 1947, the assets as invested of the original trust, after the erection of the building, with accretions from private sources other than the Long estate, made total assets, exclusive of the buildings, furniture and fixtures, of $337,127.93. The amount paid to the original trustees was $267,377.80, so that there ap-

pears to be an increase or gain of $69,750.05 over the original endowment. But due to the increase in costs per capita there has been an annual deficit for some years in the cost of operation, which has been reducing annually the funds on hand for operation. It was further testified that the present trustees cannot get first mortgages on city and Lancaster County real estate in sufficient amounts and on adequate security to take up the money that they have for investment; and that 10, 15, and 20 years ago it was possible to get first mortgages in Lancaster City real estate at 5 percent or 6 percent interest. The mortgages currently held by the home, approximately $133,000.00, are bearing 4 percent interest.

The real estate belonging to the Henry G. Long Asylum is situated almost at the western boundary line of the City of Lancaster. . . . It consists of land originally owned by the Longs. . . . A large, commodious . . . building has been erected, divided into accommodations for 50 guests. . . . West of the present Henry G. Long Asylum building, the land is unimproved, being at present used as a lawn. It has growing thereon a few fruit and other kinds of trees, and is generally surrounded by a variety of shade or ornamental trees. Part contains a sizeable vegetable garden; and approximately in the middle of the property, fronting on West Walnut Street, was originally erected a large brick stable, now used as a janitor's house.

On the opposite sides of the various streets on which the Henry G. Long Asylum is presently maintained are erected a large number of single and semi-detached homes. . . . This vicinity has been described as being a very high-class neighborhood: "exceptionally so, I think the finest in town."

At various times, as testified by the matron of the home, the home contained as many as 52 guests. At the present time the home houses 11 between 80 and

90 years of age, 24 from 72 to 77 years of age, and 5 from 62 to 68 years of age. There are four bed patients. . . . Since the home was opened, 206 guests have been admitted and have withdrawn; and the present resident list is 40 guests. When the home was originally opened, it was laid out for about 35 guests, but subsequently a parlor and infirmary were divided into rooms in order to accommodate the number of guests indicated. . . .

The present trustees are considering the advisability of increasing the income in the endowment funds by investing some of the funds in real estate by the erection of an apartment building, described as generally to contain 24 apartments, proposed to be erected in 5 sections, . . . a short distance east of the building line of Race Avenue. . . . The distance from the rear of the proposed apartment houses to the west line of the Henry G. Long Asylum home would be approximately 235 feet, in which there would be a drive in the rear of the proposed apartment house extending from Walnut Street to Marietta Avenue as an entrance to garages, one of which would be in the basement for each tenant. The proposed apartment house would be a two-story building erected in an area providing ample "set back" from the building or property lines on adjoining streets, and would cost, it is estimated, about $200,000. This is a general outline of the nature and character of the proposed investment of endowment funds now on hand for investment.

At the hearing a resident professional engineer, employed by Mr. D. S. Warfel, testified that he had examined the proposed plans for the 24-apartment house to be erected as herein described by the present trustees; . . . and he described the project as being "modern apartments in every respect."

Mr. C. G. Engle, in the real estate business in Lancaster City since 1897, testified that the housing situ-

ation in the City of Lancaster is acute and many people have applied to him for apartments in Lancaster City; that he understood the plans of the proposed apartments, which he described as being unusual in their completeness and layout, and better than the average sized apartment; that they will be located in a section of the city that will always be desirable because it is a distinctive residential neighborhood; that in his opinion apartments would rent from $80 to $90 per month and that there would be a demand for them at that price. Mr. Engle testified that there is little demand for good mortgages at the present time and that has been true for the last three or four years.

It appears to this court that . . . the primary purpose and intention of the wills of Henry G. Long and Catharine H. Long was the maintenance and support of a certain class of single and indigent women. This purpose and intention was a charity, and must be governed by charitable rules and regulations and principles of equity. The requirement and restriction on the investment of the endowment funds of said home . . . in first mortgages . . . was not the primary purpose and intention of testator and his daughter. That was an administrative feature of the management of the trust funds in order to safeguard the same in the best security then known to testators.

The trustees of the Henry G. Long Asylum at the present time are met with a most serious shrinkage in the incomes derived from the funds in their keeping from their inability to secure first mortgages having what is considered adequate security at a profitable rate of interest, and with a tremendous increase in the cost of the care and maintenance of the guests in their home during the past years. At the present time it apparently costs more to maintain 40 guests in the home than the 50 guests cost some years ago, and the incomes from the endowment funds will not support the 40 members now at present in the

home. There appears to be 23 proposed applicants for admission to the home, which manifestly the trustees at this time are unable to admit, by reason of inadequate incomes.

Since the dates of the several wills a vast change has occurred generally in the operation of trust funds: See the various Fiduciary Acts of the Commonwealth of Pennsylvania, which have culminated to date in the Acts of May 31, 1947, P. L. 350, June 5, 1947, P. L. 411, and June 27, 1947, P. L. 1080. These various acts apply more especially to the duties relative to the investments by general fiduciaries of general trust funds. These fiduciaries under general powers have several duties which may be fulfilled generally by the receipt of certain moneys or properties, the investment of the same for a particular class of persons for a particular period of time, and the moneys, properties, or the proceeds remaining in the hands of the fiduciaries are payable to a particular class of people. But in the instant case the rights of no remaindermen are fixed. The duties of the trustees and their successors, as fiduciaries, are to establish and maintain an asylum or home for a certain class of persons as beneficiaries of the trust fund. The measure of the duties of the trustees was generally determined by the size of the original buildings and the incomes of the funds provided for the maintenance of the real estate and the support of the inmates and guests who may be admitted from time to time. The provisions of the instant trust fund do not provide for the ultimate liquidation of the fund and the payment thereof to certain remaindermen. It may be conceded that persons possessing the necessary qualifications have been admitted, but due to facts and circumstances over which the present trustees have no control, the incomes available are less than necessary to meet the rising costs of maintenance and support of the guests. It is obvious that the present

trustees cannot get rid of their obligation to maintain and support the present guests of the home. To do so would require the reduction of the number of guests or inmates to about half the capacity of the physical resources of the home. No person can foresee when the incomes may increase sufficiently in amount to adequately provide the funds for the necessary support of the inmates. . . . To use the gains or "fat" accumulated by the wise management of the home through the years to meet annual deficits would be most unwise if persisted in during a long period of years. It, therefore, seems especially proper that the incomes should be increased more proportionately to the costs of operation by investing the sums for investment in real estate as requested, and in the securities which would provide necessary incomes other than first mortgages on real estate.

In A. L. I. Restatement of the Law of Trusts, §381, it is provided:

"The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust."

In Kramph's Estate, 228 Pa. 455 (1910), the court said:

"Under the general jurisdiction of a court of chancery to administer the estate of a charity, it has power to vary the precise terms of a charitable trust, when necessary. This rule is too well established to be doubted. It is thus expressed by Lowrie, C. J., in City of Philadelphia v. Girard's Heirs, 45 Pa. 9 (1863), 'When a definite function or duty is to be performed, and it cannot be done in exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close approxima-

tion to that scheme as reasonably practicable; and so, of course, it must be enforced. It is the doctrine of approximation, and it is not confined to the administration of charity, but is equally applicable to all devises and contracts wherein the future is provided for, and it is an essential element of equity jurisprudence.' "

In the recent case of In re Kirby Memorial Health Center, 36 Luz. 70 (1941), the trustees of an inter vivos trust presented their petition to the court of common pleas asking authority for the trustees to invest in bonds, debentures and shares of stock, common and preferred, of private corporations without the restrictions contained in the deed in trust given by the late Fred M. Kirby. This deed in trust provided:

". . . to invest and re-invest the same in securities authorized by the laws of the State of Pennsylvania as lawful for investment by fiduciaries. I advise particularly investment in first mortgages on real estate located in centers of population. If at any time securities authorized by law are not available in sufficient amount, or those available should yield too small an income, investment may be made on railroad corporation bonds that are secured by first mortgages on the whole or important parts of important railroad corporation property."

The deed in trust provided for the erection and maintenance of a health center or hospital. Income from endowments decreased from $30,000 in 1932 to $21,000 in 1940, which caused a serious curtailment in the operation of the hospital and maintenance thereof, whereby it was necessary for the City of Wilkes-Barre to contribute a considerable amount of money in the latter years. The court in Luzerne County based its decision on the A. L. I. Restatement of the Law of Trusts above quoted, and Kramph's Estate, supra, and held that the true rule was:

294

"While the Courts will ordinarily decline to interfere with the provisions of the instrument as to investments if an emergency arises which threatens to bring about a loss, they have power to relieve the trustee from the duty to obeying." Whereupon the court granted the petition.

In the instant case Henry G. Long appears to have been born on August 23, 1804, admitted to the courts of this county as a lawyer in the year 1827 and was subsequently elevated in 1851 to the bench of Lancaster County as its fifth president judge. His term expired on December 1871. It would appear to this court that mention should be made of the years of service rendered by Judge Long in this community in order to appreciate the great changes, socially, economically, scientifically, financially, judicially, and charitably that have occurred, not only since a long period covered by the life of Judge Long, but from the date of the execution of his will, and thereafter for a period of half a century down to the present time. His essential purpose was charitable in character. It is the duty of this court, with such means as may be available, to see that his charity is carried into effect as may be done at the present time in view of the present circumstances and not to let it fail. As the learned court said in the case of Kirby Memorial Health Center, supra, at page 73:

"It would indeed be a public calamity if the basic purpose of the donor should be defeated by a literal adherence to the deed of trust. The primary intent and desire of the donor, that the health of the public be preserved and promoted by the control and elimination of disease, should be respected and carried out, even though it is necessary to change the powers of the trustee in order to effectuate such a result. We have not the slightest doubt that this course would meet with the donor's approval."

In the Kirby Estate case the prayer of the petition was granted, and the trustee was authorized in its discretion to purchase and reinvest in bonds, debentures and shares of stock, common or preferred, of private corporations. This court feels impelled to carry out a similar decree on the petition of the present trustees of the Henry G. Long Asylum.

The petition of the trustees of the Henry G. Long Asylum for approval of the proposed plan for investment in real estate by the erection of an apartment house is presented under the authority of the Act of July 2, 1935, P. L. 545, sec. 2, 20 PS §804, which provides as follows:

"A fiduciary holding monies to be invested as aforesaid may present a petition to the Orphans' Court having jurisdiction of his accounts, stating the circumstances of the case and the amount or sum of money which he is desirous of investing; whereupon it shall be lawful for the court, upon due proof, aided if necessary by the report of a master, to make an order directing the investment of such moneys in real estate in this Commonwealth other than ground rents, or in the bonds or certificates of debt now created or hereafter to be created and issued according to law by any other state of the United States, or by any of the counties or cities of such other state, at such prices, or on such rates of interest and terms of payment, respectively, as the court shall think fit: Provided, That no such investment shall be directed unless it shall be the opinion of the court that it will be for the advantage of the estate, and no change be made in the course of succession by such investment as regards the heirs or next of kin of the cestui que trust: And provided further, That nothing herein contained shall authorize the court to make an order contrary to the directions contained in any will in regard to the investment of such moneys."

The investment at the present time of the funds which the trustees of Henry G. Long have on hand for

investment for the erection of the proposed apartment house as real estate on land currently owned by them, appears to be an entirely reasonable form of investment, and the incomes to be derived from the proposed investment appear to be ample to relieve the trustees from the necessity of meeting an annually accruing loss in funds necessary to operate and maintain at full efficiency the Henry G. Long Asylum, which was the primary intention of testators.

This decree will relieve the trustees of their immediate necessity and attain some solution of their problems. Since the death of Henry G. Long and the active life which he lived in the community, a great change in the administration of charities of the character contemplated in his will appears to this court to have taken place in our community. The word indigent seems to be susceptible in the minds of different people of different shades of meaning depending much upon the time and the manner and purpose in which the word indigent is used. To one person it may mean an absolute lack of any funds whatever, or it may mean a deficiency in such funds as to cause an ordinary person not to live and be maintained with adequate shelter, food and all the other necessities of life, which go to make up the present standard of life in this community, A respectable white single woman without roof or shelter, or food or clothing 100 years ago may have been adequately supported, in the opinion of certain persons, by the public in the poor house. A view of such an attitude towards life may have been demonstrated to have been in the category of an indigent person. The Commonwealth of Pennsylvania itself has recognized this distinction and has provided for the support of poor, aged and friendless persons by its award of old age assistance, which is entirely a new conception of the duties of a State or the public toward certain unfortunate persons. Therefore, while this court is discussing the several problems herein

mentioned, it cannot refrain from mentioning the fact that, in the present emergency, if the present or succeeding trustees, in the exercise of their discretion, would decide to adopt as a policy the admission of guests into their care and keeping upon the payment of such old age assistance as may be provided by the State or the public, it cannot be said that their determination and exercise of said discretion should be entirely foreign to the purpose set forth in the wills that have been made so long ago.

It is believed by this court that the time has arrived when the wills above referred to, establishing charitable trusts, must be operated according to equitable and cy pres principles according to the provisions in the Estates Act of April 24, 1947, P. L. 100, wherein it is provided in section 2(c) : "Nothing in this section shall limit any power of court to terminate or reform a trust under the existing law." See also in reference to charitable trusts, the case of Cameron et al. v. Kranich et al., 50 Lanc. 531.

### Decree

Now, January 22, 1948, it is ordered, adjudged and decreed by the Orphans' Court of Lancaster County, that, notwithstanding the provisions of the last will of Henry G. Long and Catharine H. Long requiring the endowment funds in the hands of the present trustees of the Henry G. Long Asylum to be invested in first mortgages on real estate in Lancaster City and County, the said trustees are authorized and directed, in the exercise of their sound discretion, to invest the sum of approximately $200,000 of the funds now in their hands for investment in real estate, by the erection and maintenance of an apartment house on the western end of the real estate now owned by them, to conform generally and approximately with the description thereof and of the size within set forth, for the use of the rentals accruing therefrom over and

298

above the costs, expenses and operation thereof to the investment advantage of the inmates or guests of the said Henry G. Long Asylum, and permission is also granted to invest the endowment funds from time to time in accordance with the acts of assembly provided for the investment of endowment funds, and the said trustees are authorized in their discretion to purchase and reinvest in bonds, debentures, shares of stock, common and preferred of private corporations, in conformity with the decrees of the court made in the case of In re Kirby Memorial Health Center, hereinbefore referred to.