## Barclay Estate

490

*Guy S. Claire*, for accountants.
*Wesley W. Silvian*, for claimant.
*Daniel L. Quinlan, Jr.*, for Commonwealth.
*H. Ober Hess*, master.

TAXIS, P. J., March 17, 1959.—The reason or purpose of the filing of the account now before the court is

the death of the sole life beneficiary, Marie M. Moelhoff, on October 2, 1950. . . .

On April 26, 1955, the United States Attorney General filed with the clerk of this court formal written objections to the account seeking to surcharge the trustees in the amount of $10,000, said sum representing the amount of an allegedly wrongful payment to the estate of the deceased life tenant. . . .

The interest of the United States Attorney General in this proceeding stems from a vesting order (no. 5122) issued on July 17, 1945, by the Alien Property Custodian, which vested "for the benefit of the United States . . . all right, title, interest and claim of any kind or character whatsoever of the trustees or governing body of any college or university to be designated in accordance with the provisions of the Will of Marie Moelhoff Barclay, deceased . . .". The Attorney General of the United States has succeeded to the powers and functions of the Alien Property Custodian.

The will of this decedent provides for the disposition of the remainder of decedent's testamentary trust to a German college or university to be designated by the life tenant. The present order vested "right, title and interest" of my trustee or governing body of a college or university so designated. Accordingly, the Attorney General is not entitled to possession of any of these funds until the court has adjudicated the extent of the interest which he has acquired in this estate.

The $10,000 payment questioned by the Attorney General was paid by the trustees to the estate of Marie Moelhoff, niece of decedent, pursuant to the terms of the following portion of decedent's will:

"Should it be deemed advisable to dispose of the assets at Narberth, Pennsylvania, the proceeds of the assets shall be accumulated until all the assets have been sold and proceeds collected. Then, after all taxes and expenses relative thereto have been paid, I direct

my Trustees and Executors to pay outright to my niece, Marie Moelhoff, the sum of $10,000 and to my nephew, William Moelhoff, the sum of $8,000."

Marie Moelhoff, subsequently known as Marie Moelhoff Hansen, died on October 2, 1950, and it is conceded in the brief of the attorneys for the accountants that her death occurred before the sale of the assets at Narberth had been completely consummated. The Attorney General takes the position that this fact defeats the legacy on the theory that the legacy was contingent upon the niece surviving the liquidation of the "assets at Narberth."

The interpretation of whether or not a legacy is vested or contingent is dependent upon testatrix' intention as expressed in her will. Such intention is to be gathered from a reading of the whole will: Packer's Estate (No. 2), 246 Pa. 116, 124; Waln's Estate, 228 Pa. 259, 264. "The proper course of procedure for the interpreter of a testamentary writing is not to apply rules of construction until all reasonable effort to deduce a meaning from the writing itself has been exhausted with no understandable and sensible result": Buzby Estate, 386 Pa. 1, 8.

A careful reading of the entire will impels the conclusion that testatrix intended this legacy to be vested in her niece and not contingent.

In her will testatrix stated that her life had been one of "hardship and a struggle to surmount economic obstacles and sickness." She also noted that during the course of this struggle she had not received any assistance from her relatives with the exception of her niece, Marie Moelhoff, the beneficiary of the disputed legacy, and her nephew, William Moelhoff, both of whom helped her in the operation of her business. Accordingly, at the outset of her will testatrix asserted: "It is therefore my sincere wish to compensate

my niece, Marie Moelhoff, and my nephew, William Moelhoff, for their devotion and assistance to me."

Testatrix then addressed herself to the creation of certain charitable trusts discussed infra, and referred to these trusts as "my next chief concern." From this express statement, as well as from the tenor of the will as a whole, it is apparent that testatrix' *first* chief concern was her niece and nephew alluded to in the immediately previous paragraph of the will. It should also be noted that testatrix referred to her niece and nephew concurrently and placed them both in a favorable position as compared to that of her other relatives who had "shown no concern or consideration for my welfare to warrant any consideration of them in the distribution of my estate."

Testatrix then gave all her assets, real and personal, to her testamentary trustees and directed that if her niece, Marie Moelhoff, continued to manage the business, she was to receive a salary of $2,000 per annum and 30 percent of the net annual profit. Her nephew, if he participated in the operation of the business, was to receive 20 percent of the net annual profits. The disputed legacy was created when testatrix turned her attention to the possibility of liquidation of the business assets at Narberth. Testatrix directed that should liquidation of the business become advisable and after said liquidation had been completely effected, the executors were to pay "to my niece Marie Moelhoff, the sum of $10,000, and to my nephew, William Moelhoff, the sum of $8,000." Again it is significant that both legatees were dealt with concurrently and that no distinction was made between them other than the variance in the amounts of the legacies.

Testatrix then directed that the proceeds of the liquidation of her Narberth assets be invested in first grade income-producing securities, and directed that the income be paid to her niece for life.

With regard to the $8,000 legacy to her nephew, testatrix directed that if her nephew decided not to return to Germany and did not wish to continue working for the estate, his legacy was to be paid to him "outright instead of waiting until the Narberth assets are liquidated."

Clearly, then, testatrix did not intend the legacy to her nephew to be contingent upon the complete liquidation of the Narberth assets. Furthermore testatrix asked that her niece buy out her nephew's "interest" or arrange for the trustees to mortgage the Narberth real estate in order to raise the necessary $8,000. The description of the nephew's legacy as an interest supports the conclusion that this legacy was vested, and in view of the similar treatment accorded to both legacies throughout the will, it cannot be concluded that testatrix intended to distinguish between them. The cogency of this conclusion is highlighted by the fact that testatrix' niece and nephew were her first and primary concern, and as between the two, it is apparent that the niece was favored above the nephew. It would then be incongruous to find an intention on the part of testatrix to discriminate against the niece and to favor the nephew with regard to these legacies by placing the nephew's legacy on a higher plane than that of the niece.

The Attorney General has argued that the purpose of the legacy to the niece was to tide her over in the event of a liquidation during the hiatus between the cessation of her income from Narberth assets and the time when the trust investment would begin to yield dividends and that therefore her legacy was not to become effective until the Narberth assets had been completely liquidated. However this interpretation necessitates speculation as to what testatrix might have intended, which is unwarranted by the language of the will, especially in light of the primary favored

position of this beneficiary. It is clear that testatrix intended the niece's legacy to vest as well as that of the nephew and the contingency expressed related only to the time of the payment of the legacy.

In light of the above interpretation based on the language of the will it becomes unnecessary to rely on rules of construction. However it should be observed that any remaining doubts that might exist must be resolved in favor of vesting. It is well settled that the law prefers vested over contingent interests, and " 'an interest is to be construed contingent only when it is impossible to construe it as vested' ": Newlin Estate, 367 Pa. 527, 534.

Accordingly it is ruled that the payment of the $10,000 legacy to the estate of Marie Moelhoff was authorized and proper under the terms of the will. The objection of the United States Government is therefore dismissed.

We next turn our attention to the two charitable legacies contained in the will. The first may be called the Educational Endowment, and was created by testatrix as follows:

"In keeping with my own experience, my next chief concern is to distribute the residue of my estate where it will do the most good to help young women, who by their own efforts have shown themselves worthy of assistance. I therefore wish to create an endowment fund to be known as Marie Moelhoff Barclay Endowment Fund to be given to the Trustees or Governing Body of a reputable college or university in Germany and by them invested and kept invested in sound income-producing securities. The income from this fund is to be used to assist worthy women students attending the university or college to complete their prescribed course. It is further stipulated that the recipients of this assistance must be residents of Vienenburg a/Harz or vicinity in Germany. The said college or

university shall be designated at a later date; however, should I die before the institution is chosen, I give my niece, Marie Moelhoff, full authority to make the selection in Germany."

The other charitable legacy may be referred to as the Hospital Endowment. It is mentioned in two places in the will of testatrix as follows:

"I wish to create another endowment fund to be known as Marie Moelhoff Barclay Endowment Fund and give it to the Trustees or Governing Body of a reputable hospital in Germany and by them invested and kept invested in sound income producing securities. The income from this fund is to be used to help pay the medical, surgical, or hospitalization expenses of young women patients of limited means who reside in Vienenburg a/Harz or vicinity in Germany. The said hospital shall be designated at a later date; however, should I die before the institution is chosen, I give my niece, Marie Moelhoff, full authority to make the selection in Germany."

Later, in the clause dealing with the sale of a farm property, there is a further allusion as follows:

"The net proceeds from the sale of 'The Farm,' after all taxes and other expenses have been paid, is to be used exclusively to establish the Endowment Fund, to be sent to a certain hospital in Germany as discussed above, the income of which is to be used to help defray the hospital expenses of women patients of limited means who are residents of Vienenburg a/Harz, Germany."

The vesting order of the Alien Property Custodian referred to above applies only to the educational endowment and not to the hospital endowment.

During her lifetime testatrix did not designate a college or hospital to be the recipient of her charitable bounty, nor did testatrix' niece ever make such a selection. In absence of such designation all parties in in-

terest in the present controversy are in agreement that the case is one requiring the application of the doctrine of cy pres. Accordingly, with the case in this posture this court by memorandum opinion dated October 25, 1956, appointed H. Ober Hess, Esq., "to make examination and investigation and make a report to the court and recommend in said report a properly suitable college or university or a suitable hospital consonant with the terms and conditions set forth in the will of Marie Moelhoff Barclay."

The master filed his report on November 14, 1958, in which he described the nature of his investigation. I should like to commend the master for his most excellent, helpful and scholarly report. The master related that he had made visits to Germany unrelated to the present case in 1952, 1954, 1956 and 1958, and that on two of these occasions, by coincidence, he had visited the town and region of Vienenburg mentioned in the will. In addition the master revisited Vienenburg during the last week of March 1957, pursuant to his commission as master, for the specific purpose of discussing the subject of his appointment with persons prominent in State, church and educational affairs.

On the basis of information obtained from the above sources, and from independent study the master recommends, in summary, that the funds involved be awarded to two Pennsylvania trustees, one a corporate fiduciary and the other an individual, to be held by them in perpetuity and to disburse the income for the benefit of women and girls under the age of 30 who reside in the Propstei, defined hereinafter, of Vienenburg and who are deemed financially deserving. The Master's recommendation contains detailed provisions for the implementation of these charitable trusts, all referred to more fully hereinafter. The significant portion of the recommendation concerns the suggestion that the funds be awarded to Pennsylvania trustees as

opposed to awards directly to a German hospital, or a college, or university, as directed by testatrix.

## The Educational Endowment

With regard to the educational endowment, the master noted that testatrix' "chief concern," to use her own words, is to help "worthy women students attending the university or college to complete their prescribed course." Beneficiaries are limited to residents of Vienenburg a/Harz vicinity in Germany. Testatrix also directed that the endowment fund so created was to be in her name and that only the income from this fund was to be used for this charitable purpose. However, testatrix also provided that the fund was to be awarded "to the Trustees or Governing Body of a reputable college or university in Germany," and the master suggests that compliance with this latter specification would render impossible the fulfillment of the previously outlined purposes of the endowment fund.

Two reasons lead the master to this conclusion. First, under the German civil law, colleges or universities do not have the legal power to act as trustee of a specific endowment fund to earmark its income for a definite purpose. Such institutions may receive legacies and award stipendia, but the legacies become a part of the general funds of the institution and awarding of these funds to students in accordance with the donor's wishes is a matter of honor, not law.

Secondly, the master concludes that if the beneficiaries of this fund are limited to worthy women of Vienenburg or vicinity attending only a single institution of learning, there frequently will be no candidates in a position to avail themselves of testatrix' generosity. The general scheme of the German educational system as contrasted to the American system necessitates this result, and a brief review of the German

educational system as outlined by the master is, therefore, in order.

All German children initiate their educational careers with four years in a volkschule. At the end of this period, when the child is approximately 10 years of age, he will either enter the gymnasium where he prepares for further studies at a university or a hochschule, or he will continue on with four more years of volkschule and then learn a trade, or he will enter a mittelschule which prepares him for white collar work of a clerical or business nature. Of these 10-year-old students about 75 percent elect to continue in the volkschule, about 9 percent enter the mittelschule and the remaining 16 percent enter the gymnasium. The gymnasium course of study extends over a nine-year period during which the students attend classes six days a week, 11 months of the year. Only one-third of the students who enter the gymnasium will survive the rigorous curriculum and attain their degree or abitur. From the gymnasium the student enters either the university or a hochschule. At the university the student is prepared to immediately embark upon his study of law, theology, medicine or other learned professions. The hochschule is a more specialized type of school which administers a single discipline. The gymnasium graduate therefore has achieved a degree of education roughly equivalent to the level of an upper classman in an American college or university.

Thus, at the tender age of 10 years, the German student stands at the crossroads of his educational career. Why do so few enter the gymnasium and prepare themselves for the higher education contemplated by our testatrix? The master has concluded that the primary reason is an economic one. Although the higher educational system is administered by the State and tuition is accordingly low or nominal, none the

less, the average German family cannot support the gymnasium or university student. If the 10-year-old child elects to continue in the volkschule, at the end of an additional four years he will enter the apprentice system and at 14 will become self-supporting. He will make no contribution to the family resources, but at least will not represent a drain.

The master noted that in 1957 only 14 children, only three of whom were girls, from Vienenburg proper attended the gymnasium, and only 50 children from the Vienenburg "vicinity", hereinafter defined, attended a gymnasium. In light of the economic factor the master concludes that the probability is high that none of those few girls attending a gymnasium is particularly poor and in need of assistance, the assumption being that the talented poor student will elect to continue on in the volkschule. Thus it is apparent that if the lifetime accumulation of Marie Barclay is to be utilized effectively "to assist worthy women students attending the university or college to complete their prescribed courses" this assistance must start at the gymnasium level and continue through the scholar's university or hochschule course of study .

The master has pointed to another characteristic of the German higher educational system which would render unfeasible an award of this fund to a single German educational institution, namely, that students in the German universities are extremly mobile and are encouraged to study at several different universities. Emphasis is placed on studying under particular professors who excel in their fields wherever they may teach, and any sense of "alma mater" loyalty as it exists in this country is subordinated to this policy. A German university student attends an average of three universities. Accordingly, to be effective, any assistance to a worthy young woman student must be

ambulatory and follow her from university to university, wherever her particular studies may lead her.

## The Hospital Endowment

As in the case of the educational endowment the master has also concluded that it would defeat testatrix' primary purpose to award the hospital endowment to a single hospital. Under German law a hospital, like a university, cannot administer a fiduciary responsibility of the nature contemplated by testatrix. Furthermore, the master reports that the immediate hospital needs of Vienenburg are served by a small institution at nearby Wiederlah, which has only limited surgical and medical facilities. Accordingly testatrix' intention will best be effectuated by making the income of this fund available to all young women of the community without reference to the particular place of their hospitalization.

With regard to the interpretation of the words "Vienenburg a/Harz vicinity," the master has suggested that this area be limited to the Propstei of which Vienenburg is the center. The master reports that the Propstei is a geographical district in the administration of the provincial church which, in this part of Germany, enjoys an official status. It is probably not more than 10 miles from Vienenburg to the farthest point in the district, and all things considered the master concludes that the Propstei provides the most logical and practical pattern for the application of the limitation to "Vienenburg a/Harz vicinity."

The doctrine of cy pres as used in this estate was defined long ago in City of Philadelphia v. Heirs of Stephen Girard, 45 Pa. 9, 28, where the court stated:

"The meaning of the doctrine of *cy pres*, as received by us, is, that when a definite function or duty is to be performed, and it cannot be done in exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close

approximation to that scheme as reasonably practicable . . ."

Thus the essence of the cy pres doctrine is one of approximation, and for the reasons outlined above this court concludes that the award of these funds in the form suggested by the master will most closely approximate the intention of testatrix to assist worthy young women from the vicinity of Vienenburg a/Harz to acquire an education and to regain their health.

As to the form of the award and the mechanics of administration it was also stated in City of Philadelphia v. Heirs of Stephen Girard, supra, at page 27, as follows:

"Possibly some of the directions given for the management of this charity are very unreasonable and even impracticable; but this does not annul the gift. The rule of equity on this subject seems to be clear, that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity, for equity will substitute another mode, so that the substantial invention shall not depend on the insufficiency of the formal intention."

Finally the fact that a German university or hospital is legally incapable of holding these funds is not a bar to effectuation of this testatrix' charitable intention under the doctrine of cy pres. If a German university or hospital cannot for legal reasons administer the trust so as to accomplish the primary object of testatrix, this court has the full power to appoint another trustee. Cf. Frazier v. St. Lukes Church, 147 Pa. 256. It is well established that a charitable trust shall not fail for lack of a trustee: Mears' Estate, 299 Pa. 217.

A question remains concerning the power of private trustees to continue to hold the corpus of the educational endowment under the terms of the master's recommendation in view of the vesting order of the

Alien Property Custodian. The property embraced by this order was defined as follows:

"All right, title, interest and claim of any kind or character whatsoever of the trustees or governing body of any college or university to be designated in accordance with the provisions of the will of Marie Moelhoff Barclay, deceased, in and to the trust created under the will of Marie Moelhoff Barclay, deceased."

It is clear that an award to domestic private trustees does not fall within the purview of this vesting order. Under such an award the principal of this trust will remain in this country in the hands of trustees who are subject to the control of this court. The income, on the other hand, is to be paid to aliens who make up the indefinite and unknown class of beneficiaries contemplated by testatrix. Altough the vesting order does not apply to the income produced by this fund, the master suggests that the vesting order could be amended to include this fund, and therefore recommends that the income be accumulated pending final disposition of the vesting order.

The report and recommendation of the master is herewith adopted and the balance of principal for distribution is awarded to Montgomery County Bank and Trust Company and H. Ober Hess, Esq., in trust, said trustees having indicated their willingness to serve in that capacity, to be held by them in perpetuity upon the following terms:

(a) The principal to be invested in investments permitted to charitable corporations under Pennsylvania law;

(b) The income attributable to the educational endowment to be accumulated pending further action affecting Vesting Order 5122 entered July 17, 1945;

(c) The income attributable to the hospital endowment to be disbursed from time to time upon requisition of a committee of three persons resident in the

Propstei of Vienenburg, Germany and chosen by the trustees with the approval of the court; such requisitions to be based upon the following stipulations: (i) Payments must be made for the benefit of women and girls under age 30 who reside in the Propstei of Vienenburg and who are deemed financially deserving; (ii) payments must be made directly to the hospital or other institution in which they are cared for; (iii) payments may be made for all forms of medical, surgical, recuperative or similar attention administered in an institution devoted to the care of the sick or the preservation of health, regardless of location.

(d) The income attributable to the educational endowment, if released from or determined not to be within the vesting order, to be disbursed from time to time upon requisition of a committee of three persons, who may be the same persons attending to the income from the hospital endowment, resident in the Propstei of Vienenburg, Germany, and chosen by the trustees with the approval of the court; such requisitions to be based upon the following stipulations: (i) Payments must be made for the benefit of women and girls under the age of 30 who reside in the Propstei of Vienenburg who are financially deserving and who are satisfactorily pursuing a course of study in any Gymnasium, Oberschule, Hochschule or university; (ii) Payments may be made directly to the scholarship recipient or to her parent or guardian so long as the committee is satisfied that the payment is being applied to make possible the advanced education of the scholarship recipient.

(e) The trustees to be subject to removal by the court;

(f) The trustees to be compensated at the rate of five percent of income to be divided between them equally . . . And now, March 17, 1959, this adjudication is confirmed nisi.